## SULLIVAN v. NATURAL GAS CO., Inc. *
### No. 4600.

Court of Appeal of Louisiana. Second Circuit.
May 4, 1934.

388

McHenry, Montgomery, Lamkin & Lamkin, of Monroe, for appellant.

Matthew C. Redmond and Dhu Thompson, both of Monroe, for appellee.

TALIAFERRO, Judge.

Plaintiff, lessee of a filling station at the intersection of Sterlington highway with De Siard street, in the eastern part of the city of Monroe, brings this action against defendant to recover damages for the alleged illegal and malicious cutting off of the supply of gas to the station and to her frame residence connected thereto. She alleges that the gas was cut off purely and simply because she would not pay a bill due by her son-in-law, B. G. Cole, for gas consumed by him and family in a residence in the southern part of the city of Monroe, for which bill she was in no wise responsible.

Defendant, while admitting that it did discontinue gas service to plaintiff from about mid-evening November 8th to 5 o'clock the afternoon of November 9, 1932, denies that its action in so doing was malicious or not warranted in law and under its contractual relations with plaintiff. It affirmatively alleged that, when the gas supply was cut off, plaintiff's son-in-law owed it no amount, and that such action was taken against plaintiff because she had knowingly violated the terms of her contract with defendant, incorporated in and a part of her application for gas service, had violated its rules and regulations relative to receiving and consuming gas, and had violated the ordinances of the city of Monroe relative to the character of and the method of installing pipes, meters, etc., in buildings previous to use of gas therein. The details of plaintiff's and defendant's positions, contentions, and defenses will be discussed as we progress in this opinion. The testimonial proof is replete with contradictions; and much of it is irreconcilable. The lower court did not undertake to reconcile it, but rendered judgment in favor of plaintiff, on the legal proposition that defendant's rules and regulations, in so far as they ascribed to it the power of determining when and whether a gas customer has complied with the laws of the city, were unreasonable, unjust, oppressive, and therefore ineffective as against plaintiff's right to recover in this suit. Plaintiff was given judgment for $300, and defendant appealed. In this court, by answer to the appeal, plaintiff prays that the judgment be increased to the full amount of her demand.

The uncontroverted facts, and facts found by us to have been established, are these:

The filling station, consisting of an open front, where cars are serviced, and three inclosed rooms, adjacent to the front portion, was erected and piped for gas prior to 1928, when the suburban section, wherein it is located, was incorporated into the city limits. A certificate of inspection issued to the owner of the station approving the gas equipment therein, evidently after 1928; gas was supplied to and consumed by the occupants of the station. The meter was removed when the station was given up by them, as it was not therein when plaintiff occupied it in June, 1931. There is a small room in the northeast corner of the station wherein was located the gas meter, the electric meter, and the air compressor. It is referred to by the witnesses as the "compressor" room, and we shall so refer to it herein. There was a small frame one-room building a few feet north of the station used for sleeping quarters, which was supplied with gas by a line from the compressor room. This building, in the fall of 1931, was removed by plaintiff and relocated a short distance east of the station, to which was added a wing of three rooms, extending westerly a few feet beyond the east wall of the station building and a lesser distance from its northern wall. This limited space between the walls of the two buildings was closed at each end so as to provide a continuous and inclosed passageway from the compressor room into the new frame building. The eaves of the roof of the two buildings for a few feet drain into a common gutter. In removing the small building to the new location, necessarily the gas line to it was disturbed and disconnected. The gas, itself was cut off by manipulation of a valve in or about the pipes of the meter loop. This was done by plaintiff's employees, and was in

violation of a law of the city. When the new frame building was completed, plaintiff's son-in-law piped three of the rooms for gas with half-inch pipe. This was also in violation of the city's law, which required that such pipe be not less than one inch in diameter. The new piping was connected with the house line in the compressor room, and, after a meter was hung in the loop therein, on plaintiff's application on November 27, 1931, gas was turned on by defendant. This meter was furnished and hung by defendant free of cost to plaintiff. No certificate of inspection from the city as to the adequacy of the piping, etc., of the frame building was required by defendant prior to hanging of the meter. Plaintiff regularly paid for all gas consumed in the two buildings, which was registered by the one meter in the station. No criticism or complaint was made about anything plaintiff had or had not done in connection with the piping of her new building for gas or attaching same to the line in the compressor room.

In the latter part of September, 1932, plaintiff's son-in-law, with his wife and small child, who had prior thereto resided in the southern section of Monroe, moved into and established living quarters in plaintiff's home at the filling station. She required that they pay for gas consumed in the two rooms allotted to them. To know the amount of gas, it was necessary that another meter be hung on the premises. When Mr. Cole, plaintiff's son-in-law, abandoned his residence in southern Monroe, he surrendered the meter he had been using there to defendant with instructions to hold until further advised. At that time he was in arrears for gas to the amount of $2.20, but had a $5 deposit on meter in the company's hands. Such deposits are not applicable to payments of gas bills so long as the user's account is alive; that is to say, as long as he is using the meter, or has not definitely surrendered it without condition.

On October 5th, Mr. Cole applied to defendant to transfer and hang in plaintiff's residence the meter he had formerly used, so as to comply with her wishes about paying for the gas. No objections were made to this request and the usual formal note made thereof by defendant's office man.

The laws of the city of Monroe in force at that time required: (1) That meter loops be so located that they be easily accessible and protected from the weather, and that, as in plaintiff's case, the loop be located back of lattice line with opening so that meter may be read from the outside; (2) all gas piping attached to house line be tested and inspected in the manner and by the formula prescribed by such law, and that meter will be set and gas turned on by authorized representatives of the company only after such test and inspection shall have been made; (3) the house line from the meter must be not less than one inch in diameter for houses of five rooms or less, and one and one-fourth in diameter for buildings of six to seven rooms; (4) that under no conditions shall plumbers, fitters, or other parties disconnect any meter, connect to or disturb piping on the inlet side of the meter after once set; and (5) finally, that "all gas companies operating in the City of Monroe are hereby directed to refuse to supply any consumer unless application is accompanied by the Inspector's Certificate of Inspection."

On the face of all applications for metered gas service, it is declared: "This agreement is accepted subject to the terms and conditions on reverse side hereof."

The reverse side, in part, reads:

"Rules and regulations for sale and delivery of natural gas.
"(N. B. Subject to change).

"1. This Company will furnish free of charge the connections, including curb cock and box, between its main and the curb; also furnish and set up one meter for each residence, free of charge, provided, however, there is a main in the street on which applicant's premises front. If main is in alley, the connection will be brought to property line. All materials furnished to remain property of the Company.

"2. All piping and appliances of consumer must conform to ordinances of the City of Monroe, and Inspection Certificate furnished the Company. No person excepting Company's representative will be permitted to turn off or on the gas. * * *

"6. This Company reserves the right to shut off the gas for any of the following reasons: * * * 3. Violation of these regulations or of the application."

Cole was instructed to prepare the loop to accommodate the meter he desired installed, and made some effort to do so, but located it in the compressor room where the old one was. Defendant's meter man declined to hang the meter in the compressor room, and so informed plaintiff and Cole. The matter thus rested for ten days or two weeks, when Mr. Prophit, defendant's manager, became aware of the situation. He, accompanied by one of his meter service men, drove out to

plaintiff's place to look the situation over and learn first hand the cause of the delay. Mr. Prophit found that the meter could not be set for several reasons, namely: (1) That the loop had not been properly prepared or located to meet safety requirements and the law of the city of Monroe; (2) that the pipe was of illegal size, and there was no valve in the loop as required by law; (3) that a connection had been made to serve this loop from the older one there, which meant that the gas going to Cole's rooms would have to pass through and be registered by both meters; and (4) that a half-inch service line had been run directly from the old meter loop into the frame house. He further says: " * * * We explained to Mrs. Sullivan what the ordinance provided in that case and explained to her that the law would not permit but one gas opening on a half-inch line. We also explained to her that there was no inspection ticket on the meter loop and explained that the law required this ticket be attached before we set the meter. We asked her if she had received an inspection certificate and she said she had not. We went around the house and looked at the piping and decided it was not only not built according to law, but had been done in such haphazard manner that it was dangerous."

Mr. Prophit further testified that, after he told plaintiff he would not set the meter on the loop provided by her, she remarked that she would tie a line from the frame house into the line in the filling station, and he then told her that would be a violation of law. He said that at this time the line to the residence was not actually connected to the line in the compressor room, though it may have previously been connected. The testimony of Mr. Prophit is substantially corroborated by Mr. Reynolds. Mrs. Sullivan's version of what was said and done at the time is quite to the contrary. She says that the only thing Mr. Prophit criticized or complained of was the location of the loop in the air compressor room, whereas the latest ordinances of the city of Monroe required these loops to be on the outside of the building, easily accessible to defendant's readers. Her testimony is corroborated by other witnesses.

An agent of defendant called at plaintiff's place on the mornings of November 7th and 8th, he says, to set the meter, but could not do so because she did not have an inspection certificate from the city, and advised her that unless she adjusted her pipes and connections to meet the requirements of law and secured this certificate, her gas supply would be cut off. Plaintiff says this agent did nothing more than demand payment of Cole's bill, and, she having refused to do so, informed her that because of her refusal the gas would be cut off. Obeying instructions from Mr. Prophit, this agent cut the gas off the evening of November 8th.

During that day Mrs. Cole called at defendant's office and settled the bill due by her husband from the $5 meter deposit in defendant's hands, receiving in cash the difference of $2.80. Whether this settlement took place before the gas was cut off or afterwards is one of the several controverted questions of fact in the case. If it happened after the gas was cut off, that would tend to support plaintiff's contention that because this bill was not paid by her the gas was cut off. If it transpired before the gas was cut off, this would tend to corroborate defendant's contention that the bill had nothing to do with its action in stopping gas supply to plaintiff. A diligent study of the testimony on this question has convinced us that the bill was paid before the order issued to cut off plaintiff's gas supply. Mrs. Cole is positive she did not visit defendant's office after learning that the gas was cut off. She also states she left her mother's place on the 12:30 bus to see a physician in Monroe, and while there learned that the gas had been cut off, and she returned to her mother's place within thirty minutes after she received the information. She says she arrived back at about 2 o'clock. She must have visited defendant's office before going to the doctor's. Plaintiff and two of her witnesses say that it was cut off at about 1 o'clock. Mr. Blackman, defendant's cashier, testified that Mrs. Cole called at the office between 1 and 2 o'clock and the settlement was then had, he paying her the difference and taking her receipt, which is in the record. He further stated that at that time Mr. Prophit was at lunch, and when he returned a brief time thereafter the matter was reported to him. Prophit, according to evidence in the case, issued instructions to cut the gas off at 2:35 o'clock, and the employees who carried out the order say it was cut off at 2:50 o'clock. It is reasonable to conclude that the decision of Mr. Prophit was made only after he knew the Cole meter was not going to be used. He knew this definitely when Mrs. Cole asked for the settlement. Mr. Prophit, anent this question, testified:

"Q. For what reason was Mrs. Sullivan's gas cut off? A. Because she tied the gas line from the frame residence to the line of the filling station illegally, after she had

been notified by me personally if she did so that we would be forced to disconnect her gas."

At 5 o'clock the evening of November 9th, defendant again turned the gas into plaintiff's pipes. Before this was done, she called at defendant's office to pay her gas bill for the preceding month and while there asked Mr. Prophit why her gas had been cut off. He gave her the same reasons as are urged in this suit. She contradicted him, stating that it was done because she would not pay Mr. Cole's bill, to which Prophit replied that Cole owed his company no amount when the gas was ordered discontinued to her. She then told him that her grandchild was sick in her home and there was no heat there with which to make it comfortable. He consulted other officers of the company, and it was decided to resume supplying plaintiff with gas. Plaintiff's violation of the city's ordinances was reported to one or more of its officers, and the matter seems to have thus been closed.

It has been held that, where just cause exists for discontinuance of gas to a customer, even though the act of discontinuance be characterized with malice and a desire to do injury to the customer, no action lies for damages. 28 Corpus Juris, p. 569, par. 32.

■ We are inclined to believe that, after Cole and his family moved into plaintiff's home, on account of the relationship existing between them, defendant's agents did try to induce plaintiff to pay the bill he was due for gas, and the weight of the testimony sustains her contention that they threatened to cut her gas supply off if she did not pay the bill. On the other hand, we can see no reason why defendant or its collectors should have been apprehensive about the bill, as the meter deposit was still in its possession, conditional, at least, security for the bill's payment. We cannot conceive that those directing defendant's affairs could, or would, for a moment, resort to such tactics to collect any bill, and do not believe the conduct of the collectors was inspired or authorized by defendant's management. It would be a most reprehensible violation of the conditions of its franchise and the terms of its contract with a customer, exposing it to certain damages, to discontinue gas to him because he declined to pay the bill of some kinsman, for which he was not morally or legally responsible. However, we have found that the order to cut off the gas issued after the bill against Cole had been paid; therefore plaintiff's charge that the gas was maliciously discontinued because of the nonpayment of the bill is not sustained. We shall have to now determine if, for the reasons assigned by it, defendant had the right to stop supplying plaintiff with gas.

After the case was tried, and pending time for filing briefs, plaintiff filed a plea of estoppel in bar of defendant's right to plead and urge the defenses it set up in justification of its action in cutting the gas off. Substantially, this plea says:

That, as defendant installed a meter in the filling station in the latter part of 1931, at which time the pipes, connections, etc., in the station and residence were the same as on November 8, 1932, any defects therein cannot be urged to justify cutting the gas off; that not having required production of a certificate of inspection when the meter was hung in 1931, it is now too late to urge this omission to justify its said action; that, having supplied plaintiff with gas for more than 12 months through said pipes and connections, it cannot now complain of the manner of installation, the size or location thereof, to excuse itself for cutting off the gas; that it is without interest to raise the question of defective or inadequate gas lines because of dangers or hazards thereof, since, under its rules, customers are required to assume all liability arising from such defects, because it recognized plaintiff's right to gas service by turning it on, after having illegally cut it off, and that, too, through and into the same pipes, connections, etc., because of the alleged inadequacy and defective condition of which defendant seeks to justify its denial of gas to plaintiff for a while.

■ It is not shown that any of defendant's officers knew plaintiff had connected her house line with the filling station line until November 7, 1932. Mr. Prophit said he did not know of it prior to that time. She says it was connected when Mr. Prophit visited her place in October. He says not. However, we do not think this issue of fact has a decisive bearing upon the right defendant had to enforce the terms of its contract with plaintiff. She was actively violating the law of the city of Monroe and the rules and regulations of defendant. It had no right, had it so desired, to connive at or acquiesce in her illegal action. It could not be estopped or precluded from requiring her to comply with the city's ordinances with reference to obtention of certificate of inspection as a prerequisite to a continuance of its gas supply to her. It was in the exercise of a legal

right, clearly vested in it, that the gas was discontinued. She consented that this course be taken, under the facts disclosed, when she applied for gas service. Fos v. Nylka Land Company, 11 Orleans App. 68.

The matter may be pertinently considered from a different angle. Had plaintiff the right to compel defendant by mandamus to continue to supply her with gas under the circumstances of her case? It would hardly be contended that she had such right. If she had not the legal right to compel defendant to do this, it follows that defendant had the right to put an end to conditions, a continuance of which made it particeps to the law's violation. The academic question of the right of defendant to cut off gas supply to plaintiff, when it was done, is not affected by turning it on thereafter out of humanitarian or other motives, with the knowledge of the city.

In State ex rel. Kells, Jr., v. N. O. Gaslight Co., 108 La. 67, 32 So. 179, it was held that mandamus was the appropriate remedy to compel a gas company to supply gas to an applicant entitled thereto, but it was also held therein, that "The plumbing must be done according to the company's requirement, and report made and certificate issued."

The lower court held that the rules and regulations of defendant gave it the right to determine when, and if, a consumer of gas had violated the laws of the city, and therefore were unjust, unreasonable, etc. We do not agree with this conclusion. The city itself determines when the applicant for gas has met its requirements, not defendant. It is only after a test and inspection by the city that a certificate of inspection is issued; and issuance thereof should not take place until it has been found that the applicant has complied with the law, and, when so issued, it entitles the applicant to gas service and is protection to the company in supplying the gas. The fact that an applicant has not secured such a certificate argues strongly that he is not entitled to one because he has not met the requirements of the city's laws. These laws leave practically nothing to the defendant's discretion. It is vested with power to determine when its own rules and regulations have been violated. If it errs in this regard and illegally cuts off a customer's gas, of course, it is responsible for such a tortious act. Glover v. Southern Cities Distributing Company (La. App.) 142 So. 289.

For the reasons herein assigned, the judgment of the lower court is annulled, avoided, and reversed, and plaintiff's suit is dismissed, and her demands rejected, at her costs.